**In re Clifford D. HRIM, Kim R. Hrim, Debtors.**

**James L. GLENN, Plaintiff,**

**v.**

**Clifford D. HRIM, Defendant.**

**Bankruptcy No. 92–62796.**
**Adv. No. 92–70206A.**

United States Bankruptcy Court,
N.D. New York.

Sept. 30, 1993.

Durr & Riley (Raymond Durr, of Counsel), Boonville, New York, for plaintiff.

George C. Reid, Boonville, New York, for Defendant.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Presently before the Court in this adversary proceeding is the objection of James L. Glenn ("Plaintiff") to discharge of certain debts claimed to be owed to Plaintiff by the Defendant Clifford D. Hrim ("Debtor"). This adversary proceeding was commenced pursuant to Bankruptcy Code § 523(a)(4) and (6) (11 U.S.C. § 101–1330) ("Code").[1]

The Court conducted a trial on May 12, 1993, and allowed the parties to submit memoranda of law. No memoranda of law were provided to the Court although Plaintiff's counsel did furnish the Court with a copy of *In re Prevost*, 123 B.R. 692 (Bankr.D.N.H. 1991). The matter was submitted for decision on June 7, 1993.

### JURISDICTION

The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1) and (b)(2)(I).

### FACTS

Sometime prior to June 1, 1992, Debtor entered into a contract to cut trees on property owned by Raymond Stephens ("Stephens") over a period of three months. The contract provided for a 50/50 split of the monies received for the logs ("stumpage") between Debtor and Stephens. On Monday, June 1, 1992, Debtor visited the Lewis County offices in Lowville, New York, to inquire about the existence of a right-of-way giving access to Stephens' land. The Debtor was accompanied by a friend, James McCauley ("McCauley"). While at the County offices, Debtor was furnished with a copy of a deed which excepted and reserved a right-of-way giving access to Stephens' land along the northerly boundary of property belonging to Plaintiff. (*See* Plaintiff's Exhibit A).

Upon leaving the County offices, Debtor and McCauley travelled to Plaintiff's residence in Boonville, New York. McCauley apparently remained outside while Plaintiff and Debtor went into the residence. Debtor indicated that as a courtesy he had wanted to let Plaintiff know that he had a contract to cut trees on the Stephens' property and would be making use of the right-of-way located on Plaintiff's property. According to the undisputed testimony, both parties examined the deed and the tax map in the possession of the Debtor and agreed that the right-of-way was located along the northerly boundary of Plaintiff's property.

From the further testimony presented, there appears to be a dispute of fact concerning the understanding reached by the parties at this initial meeting. Plaintiff contends that he agreed to Debtor's use of the right-of-way along the northerly boundary of his property. This particular piece of land was described as "swampy" and covered by dense undergrowth. According to the Plaintiff, he pointed this out to Debtor, who at the time had not seen the property. Plaintiff alleged that Debtor indicated to him that the fact that the right-of-way was currently impassable would not be a problem as he had access to gravel and a bulldozer, and that any expense incurred would be worth it as Stephens' property was full of cherry trees and had not been logged for 40 years.

In contradiction to Plaintiff's testimony, Debtor testified that when the subject of the right-of-way came up, Plaintiff suggested that Debtor use the road which already existed on Plaintiff's property as a "skidder trail". This testimony was confirmed by McCauley, who had remained outside on the Plaintiff's porch steps. It was McCauley's testimony that he was able to hear the conversation between Plaintiff and Debtor, although not present in the house, as the door had been left open by Plaintiff's son. Plaintiff denies giving Debtor permission to use the existing road.

Debtor alleges that he offered to cut and remove any timber on Plaintiff's property for the same 50/50 split that he had with Stephens and suggested that they enter into a written contract. Plaintiff responded that

---

1. Plaintiff's complaint originally asserted its objection based on Code § 523(a)(6). The Court granted Plaintiff's motion at trial to amend his pleadings to include Code § 523(a)(4).

there were no marketable trees on the property. However, it was Debtor's testimony, corroborated by McCauley, that Plaintiff gave permission to remove any marketable trees Debtor found on the property for the 50/50 split, and that Plaintiff would not require a written contract since it was unlikely that they would get more than a couple of loads. Plaintiff without admitting or denying the existence of an oral agreement did indicate he had expected to receive payment on June 7, 1992, for the "few" soft maples removed from his property.

Debtor began his logging operation on Tuesday morning, June 2, 1993, using the road already in existence on Plaintiff's property, as a skidder trail rather than the right-of-way, to drag the logs out of the woods. On Thursday evening, June 4, 1993, Plaintiff visited the site and discovered that the road, located at the center of his property, was being used by Debtor and that no right-of-way on the northerly boundary had been cleared.

On Friday morning, June 5, 1993, the Plaintiff again returned to the property where he encountered Debtor coming out of the woods dragging a quantity of logs. Plaintiff alleges that he did not inquire where the logs had come from that were being dragged. He testified that the only reference to any trees concerned a "few" soft maples that Debtor had removed in order to gain access to Stephens' property from Debtor's road. However, Debtor testified that Plaintiff had asked where the logs had come from, and Debtor had told him they had been removed from the back of the Plaintiff's woodlot. This latter testimony was corroborated by Stephens' son, Jeff, who was present on Plaintiff's property that morning. Plaintiff's primary concern at the time appears to have been the damage done to the road by the heavy equipment and logs. It was Plaintiff's testimony that he had asked Debtor why he was using the road as a skidder trail and Debtor replied the he would repair the road when he was finished with the logging operation but gave no other explanation for using the road rather than the right-of-way.

At the time of Plaintiff's visit to the property on Friday, June 5, 1992, the parties discussed the possibility of establishing an escrow account to cover the repair of the road. Plaintiff suggested that $2,000.00 be set aside from the stumpage fees that were to be paid to Debtor and Stephens upon the sale of the timber. Debtor agreed to discuss the matter with Stephens but made no commitment. The proposal was also conveyed to Jeff Stephens, who told Plaintiff he had no authority to make such an agreement regarding the stumpage fees. Stephens later rejected the proposal to set aside $2,000 of the stumpage fees. When Plaintiff did not hear from the Debtor regarding the payment for the "few" soft maples removed from his property, he called his home on Sunday June 7, 1992, and left a message on his answering machine. On the tape Plaintiff told Debtor that he (Debtor) "no longer had permission to use my property" until they could straighten things out. (*See* Debtor's Exhibit 1). Debtor acknowledged that he received the message and responded by removing his skidder and other equipment from the property.

Plaintiff testified that on Monday, June 8, 1993, he returned to the site. It was at that time that he actually went to the back of his property where he discovered that hard maples and cherry trees, in addition to soft maples, had been cut on his property. According to an inventory prepared at the request of Plaintiff, these included 29 Black Cherry trees, 25 Red Maple, and 2 Sugar Maple, with an estimated value of $1,730.33. (*See* Plaintiff's Exhibit F). Debtor acknowledged that 62 or so, as listed in Plaintiff's Exhibit F, sounded like a "fair" estimate of the trees removed from Plaintiff's property.

Testimony was given by Robert W. Sauer ("Sauer"), Senior Forester for Harden Furniture, who had supervised the purchase of timber from Debtor during the period of June 1–10, 1992. Sauer provided copies of checks and invoices showing that a variety of soft maple, hard maple and cherry had been purchased from Debtor on June 3, 4 and 5, totalling over $2,800.00, less hauling charges. (*See* Plaintiff's Exhibits G, H and I). In reviewing the invoices, Sauer testified that

only one of the invoices (Plaintiff's Exhibit I) reflected a split in payment between Debtor and Stephens'. No such notation was found on any of the other three invoices. Nor was there any notation of a split between Debtor and Plaintiff. When asked about the notation indicating a split between Debtor and Stephens, Debtor testified that he had requested it after the problems he had encountered with Plaintiff.

Debtor acknowledged that he had received the first check for the wood removed from Plaintiff's property on Saturday, June 6, 1992. Debtor testified that he had intended to make payment to Plaintiff according to the verbal agreement for 50% of the stumpage fees. He claimed that he held onto the check for awhile and eventually used it to pay for food.[2] He admitted that he had paid for the use of the skidder and for hauling the timber from Plaintiff's land to the mill. He also indicated that he had attempted to continue logging for a short time thereafter. This had included removing logs from property belonging to a Robert Seelman, who owned property adjacent to that of Stephens. (*See* Plaintiff's Exhibit C). Debtor indicated that he had paid Seelman, pursuant to an oral agreement, the same 50/50 split that he allegedly had worked out with Plaintiff.

Plaintiff also presented the testimony of Robert Andrews ("Andrews"), who testified that he had extensive logging experience, having run his own operation for over 10 years, and had also had experience in road construction. Andrews had visited Plaintiff's property in mid-June and had provided him with an estimate to repair the road in the amount of $480.00. (*See* Plaintiff's Exhibit B).

On September 8, 1992, Debtor filed a voluntary bankruptcy petition under Chapter 7 of the Code. Included in his list of unsecured nonpriority debts was one in the amount of $1,730.00 owing to the Plaintiff. Plaintiff filed the within complaint on November 16, 1992, objecting to the dischargeability of a debt he asserts the Debtor owes

him in the amount of $2,210.00. The debt includes $1,730.00 allegedly owing for trees removed by Debtor and $480.00 allegedly owing for the repair of the road used by Debtor in removing the trees. Plaintiff contends that these debts are nondischargeable by reference to Code § 523(a)(4) and (6).

## ARGUMENTS

Plaintiff asserts that the Debtor willfully and maliciously injured Plaintiff by cutting and removing trees from Plaintiff's property without permission and by causing damage to the access road located on Plaintiff's property in the process. Plaintiff also claims that Debtor willfully and maliciously converted monies owed to Plaintiff to his own use, and that Debtor has committed larceny with respect to the trees and/or embezzlement in refusing to turn over the monies received from the sale of the trees. Plaintiff asserts that the debts resulting from the damage to the road and the alleged larceny and/or embezzlement with regard to sale of Plaintiff's trees should not be discharged pursuant to Code § 523(a)(4) and (6). Additionally, Plaintiff requests that the Court enter judgment in Plaintiff's favor in the sum of $2,210.00 plus interest, reasonable attorney fees, costs and expenses.

Debtor's Answer denies Plaintiff's allegations and requests the dismissal of Plaintiff's complaint, together with reasonable attorney's fees, costs and disbursements.

## DISCUSSION

As this Court has previously noted, an exception to discharge should be narrowly construed in favor of the debtor and against the creditor to effectuate the fresh start purpose of the bankruptcy laws. *In re Verdon*, 95 B.R. 877, 882 (Bankr.N.D.N.Y.1989) (citations omitted). With respect to the exceptions found in Code 523(a), the burden of proof rests with the plaintiff to convince the court by a preponderance of the evidence that the particular debt should not be dis-

---

**2.** During Debtor's testimony, he was asked whether he had been sued in state court concerning the checks he had received from the sale of the timber. He acknowledged having been served with a summons and complaint, but there was no further testimony indicating the status of that action.

charged. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

 Code 523(a)(4) excepts from discharge a debt arising from either larceny or embezzlement, as defined under federal law. *In re Jardula,* 122 B.R. 649, 653 (Bankr. E.D.N.Y.1990) (citations omitted). Embezzlement is defined as "the fraudulent appropriation of property [belonging to another] by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Id.* (citations omitted) *see also In re Goux,* 72 B.R. 355, 359 (Bankr.N.D.N.Y. 1987). The only element distinguishing larceny from embezzlement is that, in the case of larceny, the original possession was based on a wrongful taking or carrying away. *Id.;* *see also In re Kelly,* 155 B.R. 75, 78 (Bankr. S.D.N.Y.1993). In either case, the Plaintiff must establish fraudulent intent. *Id.*

 Plaintiff alleges that the Debtor removed almost 60 trees from his property without permission. (*See* Plaintiff's Exhibit F). Whether or not the Debtor was authorized to log the trees, the Plaintiff has failed to establish any fraudulent intent on the part of the Debtor. Generally, one may infer fraudulent intent by examining the nature of the party's conduct. *Id.* In the case *sub judice,* the testimony of both parties indicates that the Debtor went directly to the Plaintiff "as a courtesy" to apprise him of the fact that he intended to access Plaintiff's property in order to carry out his logging operation. The testimony also indicates that the removal of the trees from Plaintiff's property was done openly during normal daylight hours. Even after Plaintiff's visit to the site on Friday morning, Debtor apparently continued to remove trees from the property until he received Plaintiff's message on Sunday. While the testimony indicates some apparent misunderstanding with respect to whether or not Plaintiff had given his permission to cut the trees on his property, as well as the types of trees to be cut, there is no preponderance of evidence to establish that Debtor committed larceny when he removed the trees.

 Having determined that no larceny was committed by the Debtor, the Court must address whether his failure to make payment to the Plaintiff after the sale of the timber constituted embezzlement. If, as the Debtor contends, there was a contract, in the form of an oral agreement, then Plaintiff was apparently entitled to 50% of the proceeds from the sale of the trees. Generally, when there is no security interest involved, monies received by a debtor belong to the debtor and their subsequent use by a debtor is not considered embezzlement. *In re Imbody,* 104 B.R. 830, 841 (Bankr.N.D.Ohio 1989), *citing In re Koelfgen,* 87 B.R. 993, 998 (Bankr.D.Minn.1988); *In re Storms,* 28 B.R. 761, 765 (Bankr.E.D.N.C.1983). Indeed, a number of courts have held that a mere debtor/creditor relationship, in and of itself, is not sufficient to establish embezzlement. *Imbody, supra,* 104 B.R. at 840 (citations omitted). *See also Storms, supra,* 28 B.R. at 765; *In re Rigsby,* 152 B.R. 776, 779 (Bankr. M.D.Fla.1993).

 As embezzlement is defined, there are two elements that the Plaintiff must prove. He must show (1) that the debtor appropriated monies or property belonging to the plaintiff for his own use and benefit and (2) that the debtor did so with fraudulent intent. *Imbody, supra,* 104 B.R. at 841. Initially, the Court must determine whether or not the monies received by the Debtor are identifiable as belonging specifically to the Plaintiff. In *Storms* the debtor was an agent of the plaintiff. *Storms, supra,* 28 B.R. at 763. The debtor received payments from policy holders for crop-hail insurance, and once a year in November he was to pay the plaintiff for the premiums due, whether received or not, less his commission. *Id.* Over the course of the year, the debtor deposited the monies into a general account, along with the monies from other businesses with which he was involved. *Id.* The court concluded that the debtor's failure to pay the plaintiff the premiums did not constitute embezzlement. *Id.* at 765. Similarly, in *Rigsby* the parties had entered into a verbal agreement for the sale of automobile frame straightening equipment. The debtor was to sell the equipment and remit the invoice price to the plaintiff. *Rigsby, supra,* 152 B.R. at 777. There was no requirement that

the sale proceeds be segregated. *Id.* at 778. The court determined that the plaintiff had failed to sustain his burden in that its records were inadequate to establish its right to the monies. *Id.* In the absence of an identifiable fund of cash belonging to the creditor, a court is left with a simple breach of contract which is dischargeable. *In re Prevost,* 123 B.R. 692, 694 (Bankr.D.N.H.1991); *see also In re Riso,* 978 F.2d 1151, 1154 (9th Cir.1992).

Debtor acknowledged at trial that he had received payment from Harden Furniture during the period from June 1—June 10, 1992, for the trees removed from Plaintiff's property. (*See* Plaintiff's Exhibits G and H). The invoices supporting the payments to Debtor indicate that the Debtor delivered 120 logs to Harden Furniture. (*See* Plaintiff's Exhibit G and H). Plaintiff claims that approximately 60 trees were removed from his property. (*See* Plaintiff's Exhibit F). Obviously, not all the trees delivered to Harden during that period were from Plaintiff's property. Indeed, Debtor confirmed that the initial delivery included wood cut by him prior to beginning the logging operation on Plaintiff's property.

Plaintiff provided the Court with a valuation of 59 trees he claims were removed from his property by Debtor. This totals $1,492.73, exclusive of damaged trees, for approximately 8,312 board feet of various species. (*See* Plaintiff's Exhibit F). The three invoices from Harden Furniture which support the checks reflect a total of 120 trees of different species and sizes. (*See* Plaintiff's Exhibits G and H). These three invoices show payment of $2,054.12 for approximately 8,277 board feet of timber. (*See* Plaintiff's Exhibits G and H). The Court is unable to distinguish those trees belonging to the Plaintiff and the monies received for them. The invoices do not specify a split between Debtor and Plaintiff as was the case with the fourth invoice which specified payment to Debtor and Stephens. (*See* Plaintiff's Exhibit I) Based on the credible evidence before it, and assuming *arguendo* that there was a contract between the parties which would entitle Plaintiff to 50% of the proceeds, the fact that there may have been a breach in that contract does not establish embezzlement where Plaintiff has failed to identify any proceeds specifically earmarked for him which were withheld by the Debtor for the purpose of defrauding him.

The Plaintiff also claims that pursuant to Code 523(a)(6), Debtor willfully and maliciously converted property of the Plaintiff and also willfully and maliciously damaged the road on Plaintiff's property.

The embezzlement prong of Code 523(a)(4) closely mirrors a 523(a)(6) claim that there has been a willful and malicious conversion of funds. *In re Cook,* 146 B.R. 934, 944 (Bankr.E.D.Pa.1992) (citations omitted). Both analyses focus on the intent of the debtor. Not only must the Plaintiff establish that the Debtor used the proceeds to pay other debts than that owed Plaintiff, he must also show *fraudulent* intent. *See In re Weber,* 892 F.2d 534, 539 (7th Cir.1989) (emphasis added). "An intentional breach of contract, without more, is not sufficient to establish a willful and malicious injury for the purposes of § 523(a)(6)." *In re Pasek,* 129 B.R. 247, 252 (Bankr.Wyo.1991), *aff'd* 983 F.2d 1524 (10th Cir.1993).

As noted previously, the Court's focus in determining whether fraudulent intent exists is on the acts of the debtor and the context in which they occur. *Kelly, supra,* 155 B.R. at 78. In *Prevost,* the case cited by Plaintiff, the court appears to have determined that the debtor had committed a willful and malicious act when he ceased making payments to the plaintiff due to a dispute concerning the maintenance of a logging road. *Prevost, supra,* 123 B.R. at 693. In the case *sub judice,* the Plaintiff presented no evidence to the effect that the Debtor deliberately withheld payment to him because of Plaintiff's having withdrawn his permission to be on his property. It was the Debtor's testimony that he had every intention of paying the Plaintiff, but found himself in financial difficulties which ultimately forced him to file bankruptcy. The testimony indicates that he did make payments to other creditors, including the hauler and the owner of the skidder, while attempting to continue his logging operation. He also paid Stephens and Seelman the monies owed pursuant to their contracts.

The Debtor testified that he was unsuccessful in his efforts and any funds he had available eventually went to feed his family. There is nothing in the record that establishes that his failure to pay the Plaintiff was in any way fraudulent or deceitful. To the extent that *In re Prevost, supra* 123 B.R. at 693, dictates a different result with regard to a willful and malicious intent, this Court declines to follow it. In *In re Wilson,* 114 B.R. 249 (Bankr.E.D.Cal.1990), the debtor (plaintiff) had endorsed at least two joint checks made payable to himself and the plaintiff. *Id.* at 251. The debtor testified that at the time, the company had started "to fall behind on some of [its] bills," and the money had been used to "sustain [the] business." *Id.* at 252, n. 8. The court found that the debtor's conduct did not necessarily manifest fraudulent or deceitful intent.[3]

 Finally, the Plaintiff has failed to sustain its burden of proving willful and malicious injury with respect to the damage done to the road. Based on the testimony of the parties and that of Andrews, it is apparent to the Court that the road was rendered almost impassable as a result of normal logging operations. Andrews testified that there was nothing unusual about the damage given the time of the year and the wet conditions. Again, the Court must consider the intent of the Debtor. His alleged purpose in using the road was to access Stephens' property, as well as that of the Plaintiff. Plaintiff never actually told the Debtor not to use the road and there is evidence that he suggested to Debtor that he use that road rather than attempt to utilize the right of way. Rather, Plaintiff indicated that the damage having been done, he was concerned that there be monies to repair the road once the logging operation was completed. In any event, from the testimony given by Debtor, it appears that he ceased all activity on the property upon receiving notice from the Plaintiff that he was withdrawing his permission. There is nothing in the facts before this Court to indicate that Debtor took any retaliatory measures when he removed his equipment from the property. Any damage to the road appears to have been the result of normal use, whether with or without permission. Plaintiff has not introduced any evidence that would establish that the damage was incurred as the result of any willful and malicious conduct on the part of Debtor.

For the reasons stated above, it is

ORDERED that Plaintiff's complaint, as amended, seeking nondischargeability of the debts claimed to be owing for larceny and/or embezzlement pursuant to 523(a)(4) of the Code is denied, and it is further

ORDERED that Plaintiff's complaint seeking nondischargeability of the debts claimed to be owing for the damage to property and conversion of personal property pursuant to 523(a)(6) of the Code is likewise denied, and it is finally

ORDERED that neither party is awarded costs, disbursements or attorneys' fees.

---

**3.** Both *Wilson, supra,* 114 B.R. 249, and *Weber, supra,* 892 F.2d 534, were analyzed pursuant to Code 523(a)(4). However, it is the Court's view that whether the intent is deemed fraudulent or malicious, the analysis is comparable when applied to Code 523(a)(6).